IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

AUTUMN HOPCROFT                                                                                  PLAINTIFF

v.                                          CIVIL NO. 21-5225

KILOLO KIJAKAZI, Commissioner                                                      DEFENDANT
Social Security Administration

**MEMORANDUM OPINION**

Plaintiff Autumn Nichole Hopcroft brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claims for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

I.      **Procedural Background:**

Plaintiff protectively filed her applications for DIB and SSI on October 25, 2018, alleging a disability onset date of May 10, 2016, due to a combination of physical and mental impairments. Employing COVID-19 protocols, an administrative hearing was held on April 15, 2020, by telephone; Plaintiff's counsel appeared but Plaintiff did not participate. (Tr. 60- 74). Plaintiff's April 27, 2020, written response to an Order to Show Cause was judged satisfactory, and a supplemental telephone hearing was conducted by the ALJ on October 13, 2020, during which Plaintiff appeared with her counsel. (Tr. 77- 115). During the supplemental hearing,

1

Plaintiff amended her alleged disability onset date to April 30, 2018. (Tr. 41). Vocational expert Dr. Debra A. Steele, of Lightfoot Consultants, participated in both administrative hearings.

On March 10, 2021, ALJ Glenn A. Neal issued an unfavorable decision. (Tr. 37-59). The ALJ found that during the relevant period, Plaintiff had an impairment or combination of impairments that were severe: dorsalgia status post-thoracic spine fusion surgery with Harrington rods, bipolar disorder, major depressive disorder, anxiety disorder, and borderline and dependent personality traits. (Tr. 43). However, after reviewing all evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 43-45). The ALJ then found Plaintiff retained the residual functional capacity (RFC) to:

> [P]erform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(b) except she can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds, she can occasionally balance, stoop, kneel, crouch and crawl, and she must avoid concentrated exposure to hazards. She can further perform work where interpersonal contact is incidental to the work performed, the complexity of tasks is learned and performed by rote, with few variables and little use of judgment, and the supervision required is simple, direct, and concrete.  (Tr. 45) (full discussion at Tr. 45-52).

The ALJ determined that Plaintiff could perform light exertional unskilled work with additional restrictions. (Tr. 52). Thus, the ALJ found Plaintiff had not been under a disability, as defined by the Act, from April 30, 2018, through the date of his decision. (Tr. 54).

The Appeals Council denied review on August 3, 2021 (Tr. 1-4), and Plaintiff filed this action on December 15, 2021. (ECF No. 1). Both have filed appeal briefs, (ECF Nos. 18, 19) and the Court carefully has reviewed both the briefing and the entire transcript. The Court makes recitations to the record only to the extent necessary to perform its required judicial review.

## II. Evidence from the Record:

A review of the medical record reflects the following:

Plaintiff, age 20, was seen on November 27, 2015, following a motor vehicle accident which happened earlier the same day. Plaintiff reports she was a back seat passenger, hit her head at the time of the collision, heard her neck "pop," and now complains of pain to upper neck; she does not know if she lost consciousness. (Tr. 429-433). CT scans of her head and cervical spine (both without contrast) were each normal. (Tr. 435, 437). Plaintiff was seen two weeks later, on December 12, 2015, and examined related to complaints of chronic low back pain and pain in the thoracolumbar region. (Tr. 422-26). Plaintiff was provided opioids for pain relief. *Id.*

Plaintiff was seen on January 3, 2016, where she underwent a CT of her temporal bones with IV contrast, and was treated for a right ear infection with ear discharge. (Tr. 405-410, 420).

Plaintiff saw PA Mary Ericson on May 17, 2016, for a preventive exam, reporting occasional abnormal vaginal bleeding, anxiety, depression, and sleep disturbances. (Tr. 458). Plaintiff was scheduled for fasting lab work and recommended for a gynecological consult as last PAP smear was more than three years prior. (Tr. 459).

Plaintiff's next medical encounter of record is with Dr. Roy Clemens on November 22, 2016, to whom Plaintiff reports worsening neck pain. (Tr. 445- 447). Buspar and hydrocodone prescriptions were refilled by Dr. Clemens. (Tr. 446).

Plaintiff is seen on July 18, 2016, by Dr. George Benjamin for a sore throat that had continued for more than a week, reporting a negative strep test the prior week. A strep test and

mono test were administered with negative results, but because Plaintiff's white blood count was elevated, Plaintiff received a Rocephin injection. (Tr. 454-456).

Plaintiff is seen by Dr. Scott Stinnett on August 30, 2016, for an upper respiratory infection and received a cephalexin prescription. (Tr. 451-453). Plaintiff is seen by Dr. Stinnett on the following day – August 31, 2016 –for right ear pain and obtained a topical steroid cream. (Tr. 448-450).

Plaintiff is next seen by PCP Amy Schochler on January 3, 2017, with a cough and congestion and is diagnosed with an acute upper respiratory infection; Plaintiff self-reports she is nine (9) weeks pregnant and is thus directed to take OTC remedies to remediate her symptoms. (Tr. 443-444). From other medical record entries, it appears this pregnancy proceeded full term, with birth of a healthy boy.

The next record occurs when Plaintiff is age 23 and is being seen by NP Donald Wleklinski at Healthy Horizons on October 1, 2018, to establish care with chief complaints of anxiety and depression; Plaintiff reported she underwent an extensive back surgery in 2009 (age 14) and started seeing a psychiatrist the same year. (Tr. 506-508). Plaintiff recounts she dropped out of high school because of bullying and never obtained her GED. (Tr. 508). Plaintiff reported a suicide attempt (pill overdose) at age 21, and advised she see spirits and hears voices. (Tr. 508). At the time of the appointment, Plaintiff has a one-year-old son, and they live with her parents and Plaintiff's boyfriend. (Tr. 508). For her bipolar I diagnosis, Wleklinski prescribed Plaintiff oxcarbazepine, 150 mg, two times daily, and trazodone 100mg, ½ to 1 dose daily. (Tr. 507-508). Plaintiff was seen by Wleklinski two weeks later – on October 15, 2018 – for a medication consultation at which time Wleklinski discontinued her oxcarbazepine and resumed trazodone. (Tr. 505-506).

Plaintiff was seen by NP Wleklinski on November 1, 2018, where Wleklinski notes Plaintiff has tried Seroquel, Ritalin and Abilify, and did not have success with topiramax. (Tr. 503-504). Wleklinski started Plaintiff on an antipsychotic – Olanzapine – between 5-10mg nightly, for treatment of her bipolar symptoms. (Tr. 503).

Plaintiff was seen by NP Wleklinski on April 3, 2019, who noted their last encounter had been in November 2018. (Tr. 501-502). Wleklinski notes Plaintiff reports racing thoughts, negative thoughts of a body sunk in a pond and thoughts that she dropped a body into a river, nightmares of being killed, and of being easily irritated, self-describing as a "ticking time bomb." (Tr. 502). Wleklinski prescribed a low dose of Olanzapine, 2.5mg-5mg, nightly. (Tr. 502).

Plaintiff was seen again by NP Wleklinski on April 25, 2019, related to anxiety, depression, and unintended weight loss. (Tr. 499-500). Plaintiff complained of multiple stressors including her boyfriend's admission to Spring Woods for depression and psychosis; her stepsister moving back from Colorado along with her nine-month-old child who both live in the home with Plaintiff; an upcoming evaluation for cancer at UAMS due to her weight loss and loss of bladder control. (Tr. 500). Plaintiff reported no medication side-effects and reported her medications were helping with her symptoms. (Tr. 500).

Plaintiff is seen by Dr. Tracie Fullove on May 3, 2019, complaining of unintentional weight loss, lack of appetite, abdominal pain and nausea, and generalized anxiety disorder. (Tr. 475-480). Dr. Fullove diagnoses acid reflux and prescribes Omeprazole and recommends Plaintiff take Mirtazapine to stimulate her appetite; this record reflects Plaintiff has a history of anxiety, bipolar disease, and PTSD. (Tr. 478). Plaintiff reports a nocturnal cough and Dr. Fullove notes Plaintiff is a daily smoker who has smoked since age 16 but prescribes an oral cough syrup, Cyproheptadine. (Tr. 478).

Plaintiff saw Dr. Fullove a few days later and on May 8, 2019, complaining of blood sugar problems (presenting a CBG log which illustrated a few elevated CBGs) and right-sided headache with blurry vision, nausea, and phonophobia. (Tr. 540-541). Plaintiff reported she had discontinued her Mirtazapine "due to agitation." (Tr. 541). Dr. Fullove noted she would monitor Plaintiff for metabolic syndrome. (Tr. 543). Because Plaintiff reported no success with Imitrex for headaches, Dr. Fullove prescribed Rizatriptan and Zofran for nausea. (Tr. 543).

Plaintiff is seen on May 29, 2019, by NP Wleklinski at Healthy Horizons where Plaintiff described a crisis with her boyfriend who has mental health challenges and can be violent and aggressive at times which includes threats of self-harm if she left with their son. (Tr. 497-498). During the visit, Wleklinski discussed importance of consistent use of prescription medication and employing coping strategies.

Plaintiff was seen by Dr. Daniel Sales on June 4, 2019, regarding unintentional weight loss, lack of appetite and lethargy. (Tr. 534). Plaintiff also discussed daily episodes of feeling nervous, anxious, irritable, or annoyed or "on edge;" daily inability to relax; and frequent episodes of being depressed, irritable or hopeless, being forgetful, and being unable to control her worries. (Tr. 532). Dr. Sales describes in his treatment notes that Plaintiff presents with a blank expression, speaking in a monotone voice, admitting she has not been taking her medications and expressing multiple stressors. (Tr. 535). Complaints of continued weight loss since last appointment were noted as were paresthesia's in hands and feet, urinary incontinence, cough, and dysphagia. (Tr. 534-539). In addition to other advice, Dr. Sales reminded Plaintiff she needed to stop smoking cigarettes and marijuana. *Id.*

Plaintiff was seen by Dr. Marquita London on August 7, 2019, complaining of dull and achy right ear pain; Dr. London noted that plaintiff has chronic deafness, observing a green ear

tube in her left ear canal and scarring in her right. (Tr. 530-533). Plaintiff was prescribed Amoxicillin and prescription strength Ibuprofen. (Tr. 532).

Plaintiff was seen by Dr. Dennis Berry on August 12, 2019, with chief complaints of stomach pain and difficult swallowing, and reporting symptoms of cramping, burning, non-radiating pain in the epigastric area and under the jawline, nausea, mouthwatering and diarrhea. (TR. 524-525). Plaintiff reported she underwent a Nissan Fundoplication with feeding tube as an infant (in approximately August 1995). (Tr. 525). On a positive note, Plaintiff reported that she was beginning to gain weight after unintended weigh loss. (Tr. 525). Dr. Berry prescribed Amoxicillin, 500mg, twice daily and discussed upcoming diagnostic testing. (Tr. 527).

Plaintiff is seen on August 13, 2019, by NP Wleklinski for a follow up appointment for worsening anxiety and depression. (Tr. 495-496). Plaintiff reported discontinuance of her medications because she believed they were ineffective, but reported increased paranoia, increased PTSD symptoms and nightmares. Wleklinski prescribed Plaintiff Vraylar 1.5mg, trazadone 150 mg nightly, and prazosin 1mg nightly and recommended Plaintiff return to birth control. (Tr. 496).

On August 14, 2019, Plaintiff underwent an ultrasound of her thyroid at the Washington Regional Medical Center. (Tr. 545-547).

Plaintiff was seen on August 19, 2019, by Dr. Josh Kelfer, complaining of worsening abdominal pain and diarrhea. (Tr. 521). Plaintiff was referred for ultrasound of her gallbladder and an EGD, instructed to abstain from ibuprofen, and prescribed Hyoscyamine Sulfate 1.125mg for pain. (Tr. 522). On August 21, 2019, Plaintiff underwent an ultrasound of her gallbladder. (Tr. 548-549, 564-568).

Plaintiff was seen on August 23, 2019, by Dr. Dennis Berry to review her gallbladder imaging which revealed gallstones, consistent with her complaints of upper right quadrant pain, worsened by eating (and spicy and fatty foods), and abdominal pain, nausea, mouthwatering and diarrhea. (TR. 516-519).  Dr. Berry evaluated a nodule on Plaintiff's thyroid along with a swollen lymph node as well as Plaintiff's complaints about difficulty swallowing and food getting caught in her throat.  (Tr. 517). Plaintiff was scheduled to undergo an EGD with Dr. Gray on September 3 along with a CT of her neck; Plaintiff was referred to an ENT to further evaluate her thyroid, and to a general surgeon to evaluate her gallstones.  (Tr. 519).

On August 27, 2019, Plaintiff underwent a CT of the soft tissue of her neck with contrast. (Tr. 550-552, 559-563).

On September 4, 2019, Plaintiff was seen by Dr. Dennis Berry to address smoking cessation.  (Tr. 601-602).  At this appointment, she was one week out from a scheduled gallbladder removal surgery.  Dr. Berry provided counseling and prescribed Chantix.  (Tr. 602-605).

Plaintiff underwent a video fluoroscopic modified barium swallow study on October 4, 2019.  (Tr. 569-586). The results were described as "normal" without evidence of aspiration. (Tr. 582).

On October 11, 2019, Plaintiff was seen by Dr. Berry for low back pain, pelvis pain and dysuria. (TR. 596, 606-607). After discussion of Plaintiff's symptoms, Dr. Berry diagnosed her with cystitis (inflammation of the bladder) and irritable bowel syndrome associated with anxiety/depression, and prescribed Keflex 500 mg for five days, and paroxetine Hcl 20 mg daily. (Tr. 597-600).

On November 28, 2019, Plaintiff was seen by NP Wleklinski with a sever bipolar episode; Plaintiff described a worsened emotional and mental state and feelings of hopeless about her living situation with her boyfriend, reporting seeing no purpose for her life, hearing voices, and experiencing some suicidal thoughts without any plan or intent to self-harm. (Tr. 588). Plaintiff was not compliant with Vraylar, which NP Wleklinski restarted at 3mg, as well as topiramate 50 mg. (Tr. 589).

On January 31, 2020, Plaintiff was seen by Dr. John Stanton for complains of left upper back pain (left medial side in area of T2-T4) with intermittent atypical chest pain and occasional trouble breathing with heart-racing and irregular heartbeat. (Tr. 591-592). Plaintiff – who is 10 weeks pregnant – had stopped her smoking cessation program (Chantix) and her SSRI, and returned to smoking, which Dr. Stanton counseled against. Plaintiff underwent chest x-rays which were normal. (Tr. 590). Plaintiff underwent an EKG. (Tr. 609-610). Dr. Stanton discussed the role of Plaintiff's severe anxiety in causing atypical chest pain (along with Plaintiff's history of back surgery and related thoracic pain), and then counseled about recommended lifestyle changes, including smoking cessation. (Tr. 592-594). Dr. Stanton changed Plaintiff's medication to Fluoxetine and Famotidine, and recommended lidocaine patches for thoracic pain. (Tr. 594).

The medical evidence reflects that Plaintiff was seen multiple times for established care by Steven Thompson, DO. Plaintiff was seen on December 18, 2019, to confirm her pregnancy and initiate an obstetric care plan, and again on January 13, February 14, March 13, April 15, April 20, May 7, May 18, June 12, July 10, July 16, and July 24, 2020, for regular OB/GYN visits, testing and ultrasound imaging, and again on July 30, 2020, when she was tested for Strep B. (Tr. 654-681).

On August 3, 2020, Plaintiff was evaluated at Ozark Guidance by LPC Nancy Ghormley and a counsel plan with goals was commenced. (Tr. 615-620).

Plaintiff was seen by Steven Thompson, DO on August 6, 2020, during the 37th week of her pregnancy, with infections in both ears, and was prescribed antibiotics. (Tr. 652-653). Notes in other medical records indicate Plaintiff subsequently delivered her baby on August 9, 2020.

On August 28, 2020, Plaintiff was seen by Dr. Carver Haines for multiple concerns, including decreased hearing, drainage, and discomfort in her left ear; worsening chronic back pain; continuing wrist pain from a fall suffered during her recently ended pregnancy; worsening irritable bowel syndrome (IBS); continuing anxiety and depression; and a request for birth control. (Tr. 639-648). Dr. Haines prescribed antibiotics for the ear infection, and Plaintiff's preferred contraceptive. Dr. Haines referred Plaintiff to physical therapy for her wrist pain and prescribed imaging which Plaintiff underwent (x-rays of her thoracic spine and x-rays of right wrist). (Tr. 611, 612, 650-651). For Plaintiff's back pain, Dr. Haines prescribed a muscle relaxer, cyclobenzaprine, 10 mg. (Tr. 646). With respect to Plaintiff's worsening anxiety and depression, and decreased appetite with IBS, Dr. Haines prescribed Fluoxetine 20 mg daily and Hydroxyzine 25mg, as needed, along with loperamide as needed for complaints of diarrhea. (Tr. 645-646).

On September 2, 2020, Plaintiff was seen by RMA Yanni Collins for back pain; Plaintiff received counseling. (Tr. 613-614). There is also record of a visit on this date with Dr. Fabian Latorre, Jr. who added Lyrica to Plaintiff's medication regime for her upper back pain. (Tr. 634-638).

On September 18, 2020, Plaintiff was seen by Dr. Calvin Ruiz for continued complaints of back pain, and reports that her Lyrica is not helping. Noting that recent imagining illustrated

stability of her hardware and spine, Dr. Ruiz made a referral to Dr. Thurman and his pain clinic due to the chronicity of Plaintiff's pain complaints. (Tr. 627-633).

On October 16, 2020, Plaintiff was seen by Dr. Takwi Mums who diagnosed her with an ear infection, ruled out COVID-19, and prescribed antibiotics. (Tr. 623-626, 649).

After establishing care via referral on January 21, 2021, and two consultations on January 28 and February 24, 2021, Plaintiff is seen at Dr. Larry Coker's office on March 15 and 19 for interventional pain management for cervical/thoracic pain and spondylosis without myelopathy. (Tr. 9-15, 17-33). Plaintiff expressed a wish to manage worsening pain without Tramadol and other medications. Pursuant to the assessment plan, Plaintiff underwent a series of cervical/facet medial branch blocks (under fluoroscopy) on the right side at T3-4, 4-5, and 5-6. (Tr. 16, 19).

### III.     Applicable Law:

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).  A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

To determine the existence and extent of a claimant's disability, the ALJ must follow the five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education, and work experience. 20 C.F.R. §§ 404.1520, 416.920; *see also Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992). The Eighth Circuit has described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*See Dixon v. Barnhart,* 353 F.2d 602, 605 (8th Cir. 2003); 20 C.F.R. § 404.1520(a)(4).  The fact finder only considers Plaintiff's age, education, and work experience considering his or her residual functional capacity if the fifth stage of the analysis is reached. 20 C.F.R. § 404.1520(a)(4)(v).

### IV.     ALJ's Analysis:

The Court finds it helpful to recap the ALJ's analysis. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her amended alleged disability onset date of April 30, 2018. (Tr. 43). The ALJ concluded at step two that Plaintiff's dorsalgia status post-thoracic spine fusion surgery with Harrington rods; bipolar disorder; major depressive disorder; anxiety disorder; and borderline and dependent personality traits constituted severe impairments that "significantly limit [Plaintiff's] ability to perform basic work activities." (Tr. 43). At this step, the ALJ rejected Plaintiff's alleged hearing loss as a severe impairment, noting there is no evidence of record which illustrates that her hearing loss causes any significant work-related limitations. (Tr. 43). It was anecdotally noted that despite notations in the record that Plaintiff is supposed to wear hearing aids (Tr. 125), Plaintiff "did not exhibit any issues hearing during the supplemental telephone hearing held on October 13, 2020." (Tr. 43).

At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ expressly considered Listings 12.04 (Depressive, Bipolar and Related Disorders), 12.06 (Anxiety and Obsessive-Compulsive Disorders), 12.08 (Personality and Impulse-Control Disorders) (Tr. 43-44). During his consideration, the ALJ noted that Plaintiff has a tenth-grade education, and tried to but did not complete her GED. (Tr. 44). With respect to remembering or applying information, the ALJ found Plaintiff has a mild limitation, noting that Plaintiff "could count change but had difficulty handling money." (Tr. 44). Plaintiff did not require reminders but reported difficult following written and spoken instructions. (Tr. 44). In interacting with others, the ALJ determined that Plaintiff has a moderate limitation, noting that "[h]er anxiety, bipolar,

13

and depressions make it hard for her to be around many people." (TR. 44). Plaintiff reported that she talked daily to and got along with her grandmother but found other people "hateful." (Tr. 44). The ALJ observed that during Plaintiff's mental consultative examination, she was "assessed with a limited capacity to communicate and interact in a socially adequate manner but was found to have the ability to communicate in an intelligible and effective manner." (Tr. 44). With regard to concentrating, persisting, or maintaining pace, the ALJ found Plaintiff has a moderate limitation. (Tr. 44).

The ALJ then considered Plaintiff's testimony that she has back issues but could work for about four (4) hours standing before her pain occurred; also instructive was Plaintiff's testimony that she could lift five (5) pounds, stand for an hour, walk half of a mile, finish what she started, and manage changes in routine, although she admitted she had difficulty handling stress. (Tr. 44). With respect to adapting and managing herself, the ALJ found Plaintiff has a mild limitation, noting that Plaintiff was now married with two (2) children for whom she cared; cooked for 45-60 minutes per day; performed housework 30 minutes per day; cared for a pet; and shopped in stores for food about three (3) times a month for an hour at a time. (Tr. 44). The ALJ noted that Plaintiff cannot drive because she cannot pass the written test. (Tr. 44). Without at least two "marked" limitations or one "extreme" limitation, the ALJ found the Paragraph B criteria are not met. (Tr. 44-45). The ALJ also determined the record also did not establish the Paragraph C criteria because Plaintiff's mental disorder in this category is not "serious and persistent." (Tr. 45).

Moving to step four, the ALJ found Plaintiff was unable to perform her past prior work as a food service attendant, (Tr. 52-53), but that she possessed the RFC to perform light exertional unskilled work with additional restrictions. (Tr. 53-54). At step five, the ALJ concluded Plaintiff

could perform jobs that exist in significant numbers in the national economy, thus finding she was not disabled within the meaning of the Social Security Act. (Tr. 54). The ALJ relied upon a vocational expert's testimony that an individual with Plaintiff's age, education, past relevant work experience, and RFC could work in representative occupations such as housekeeping cleaner, a patch worker, and an office helper. (Tr. 53-54).

V.      **Discussion:**

On appeal to this Court, Plaintiff contends the ALJ made an error in law when applying *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984), as there was insubstantial evidence to discount the Plaintiff's complaints of disabling physical pain and disabling mental impairments. (ECF No. 18, p. 1). Plaintiff takes issue with the ALJ's recitation that Plaintiff cooked for 45 minutes a day, performed household chores daily, and grocery shopped 3 times a month, arguing this evidence simply does not appear in the record, and that the remaining evidence of record does not support the ALJ's finding. (ECF No. 18, pp. 1-2). With respect to Plaintiff's subjective complaints of disabling mental impairments, Plaintiff argues, *inter alia*, that the record reflects Plaintiff's reports of seeing spirits and hears voices; experiencing auditory and visual hallucinations; getting angry easily; having a "racing" mind; being anxious or "on edge" daily; being easily annoyed and irritable; being paranoid; being depressed, hopeless and deriving little pleasure from living; experiencing insomnia; having little energy; having no appetite and losing weight; having trouble concentrating; and suffering ongoing problems finding effective medications. (ECF No. 18, pp. 3-4). Again, Plaintiff contends the records cited by the ALJ as supportive of his reasoning do not, in fact, support the ALJ's findings, citing numerous examples where Plaintiff believes the ALJ simply got the medical evidence in the record wrong. *Id.*

With respect to the ALJ's RFC, Plaintiff says another significant error occurred. Noting the state agency consultants found Plaintiff had a severe impairment that precluded employment, Plaintiff points out the ALJ first relied on the assessment as persuasive but then dismissed it altogether when determining Plaintiff's RFC. (ECF No. 18, p. 5). Plaintiff recites that Dr. Hester, utilizing DSM-IV criteria for his assessment with included Global Assessment Functioning, scored Plaintiff's GAF as a 50 (representing serious impairment) and found Plaintiff had "limited capacity to communicate and interact in a socially adequate manner." *Id.* Plaintiff says the GAF score is consistent with Plaintiff's medical records. The mistake was committed, according to Plaintiff, when the ALJ dismissed the GAF score as an unreliable measurement of Plaintiff's functional ability. Plaintiff says the ALJ accepted Dr. Hester's findings to support his RFC determination, but then erroneously disregarded Dr. Hester's medical opinion – the only opinion in the record regarding the severity of Plaintiff's mental impairments – that Plaintiff had a serious impairment which would preclude employment. (ECF No. 18, pp. 5-6).

Addressing Plaintiff's allegation that the ALJ misquoted the medical evidence of record, the Commissioner pushes back, saying that although some of the evidentiary citations (i.e., Exhibit 6E vs. 7E, etc.), contained in the ALJ's opinion were incorrect, the summarized evidence does exist within the record. The Commissioner says the ALJ rigorously evaluated Plaintiff's subjective complaints of physical pain considering her admitted activities of daily living, acknowledging limitations but concluding Plaintiff can perform a limited range of light work. (ECF No. 19, pp. 3-6). Affirmance is urged consisted with *Polaski, supra*, and *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004). With respect to the ALJ's consideration of Dr. Hester's consultative examination, the Commissioner says the ALJ clearly explained how he

considered Dr. Hester's report in arriving at the RFC assessment and this explanation is all that is required. The ALJ was free, according to Defendant, to disregard the GAF score but carefully recognized and considered Dr. Hester's opinions in light of his examination of Plaintiff and, as was the ALJ's job, resolving any "conflicting evidence." For these reasons, says the Commission, the ALJ's opinion is entitled to deference and affirmance.

The Court agrees that the ALJ applied the proper standards and that the record supports the ALJ's decision. Despite citation errors within the opinion, the ALJ evaluated Plaintiff's subjective complaints of pain, comparing them to the objective medical evidence and finding them not entirely consistent. Consideration included Plaintiff's treatment history since she was approximately ten years old (mental health) and fourteen (thoracic fusion); ability for past work despite her young age; the conservative treatment she received during her pregnancy; gaps in her treatment; that Plaintiff's medication was frequently modified and she reported receiving relief from medications; and that she did not require any assistive devices or other treatments such as physical therapy, all in light of her admitted activities of daily living. The Court cannot say that the ALJ's analytical framework and ultimate determination – that Plaintiff could perform a limited range of light work despite her limitations – was unsupported by the record. *See Tucker v. Barnhart,* 363 F.3d 781, 783 (8th Cir. 2004) (ALJ not required to discuss each *Polaski* factor if framework for evaluating subjective complaint is recognized and considered.)

With respect to the ALJ's RFC determination, it must be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations." *Myers v. Colvin,* 721 F.3d 521, 527 (8th Cir. 2013) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). It is well established that a "claimant's [RFC] is a medical question" regarding "the claimant's ability to function in the

workplace." *See Hensley v. Colvin,* 829 F.3d 926, 932 (8th Cir. 2016) (quoting *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)). Nevertheless, "the RFC is a decision reserved to the agency such that it is neither delegated to medical professional nor determined exclusively based on the contents of medical records." *Noerper v. Saul,* 964 F.3d 738, 745 (8th Cir. 2020). The ALJ's decision "may not [be] reverse[d] merely because substantial evidence also exists that would support a contrary outcome, or because [the Court] would have decided the case differently." *David v. Apfel,* 239 F.3d 962, 966 (8th Cir. 2001).

With respect to Plaintiff's GAF score, the law of the Eighth Circuit is clear that an ALJ does not have to give GAF scores any credence, and that these scores have no direct correlation to the severity standard the Commission must employ. *See Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2010); *Wright v. Colvin,* 789 F.3d 847, 855 (8th Cir. 2015). The Court thus finds no error in the ALJ's determination that Plaintiff's GAF score has little probative value in the context of her vocational capacity. Turning next to Plaintiff's contention that the ALJ did not property consider her residual mental functioning, the record clearly illustrates that the ALJ noted Plaintiff's communication deficiencies but found she maintained the ability to communicate in an intelligent and effective manner, could handle routine changes, cope with the demands of simple work tasks, sustain concentration and persistence on basic tasks, adapt, and manage herself. The record supports that, during mental status examinations with NP Wleklinski, Plaintiff reflected that she was well-groomed, calm, euthymic, and pleasant with cooperative behavior; insight, judgment and thought processes intact; normal speech and cognition; good memory; and a good fund of knowledge, attention, and concentration.

**VI.     Conclusion:**

Because substantial evidence in the record supports the ALJ's rational and determination, the Court must defer, affirming the decision of the Commissioner and dismissing Plaintiff' case with prejudice.  A separate Judgment concurrently will be entered.

DATED this 9th day of March 2023.

*Christy Comstock*
CHRISTY COMSTOCK
U.S. MAGISTRATE JUDGE